Milo E. HEDDAN, et al., Appellants,

v.

Kenneth K. DIRKSWAGER, et al., Respondents,

and

Milo E. HEDDAN, Appellant,

v.

John SOPSIC, Commissioner of Public Safety, Respondent.

Nos. CX–82–1645, C3–83–198.

Supreme Court of Minnesota.

July 1, 1983.

Rehearing Denied Aug. 18, 1983.

Nichols, Kruger, Starks & Carruthers and James H. Kaster, Minneapolis, for appellants.

Hubert H. Humphrey, III, Atty. Gen., Thomas L. Fabel, Deputy Atty. Gen., and Norman B. Coleman, Jr., Sp. Asst. Atty. Gen., St. Paul, for respondents.

SCOTT, Justice.

This appeal is a consolidation of two lower court rulings. First, this is an appeal from the order for judgment of the Ramsey County District Court upholding the constitutionality of the new prehearing license revocation proceedings under Minn.Stat. § 169.123 (1982). Second, also consolidated for review is an appeal from an order of a three-judge panel affirming an order of the municipal court in the case of *Milo E. Heddan v. Commissioner of Public Safety* which upheld Heddan's license revocation. Heddan sought discretionary review before this court and his appeal was consolidated with the appeal from the Ramsey County District Court. We affirm.

This declaratory judgment action challenges the constitutionality of Minnesota's prehearing license revocation statute on behalf of three parties: Paul W. Lundberg, Milo E. Heddan, and Craig S. Miller.

On July 9, 1982, Milo E. Heddan was stopped in Hennepin County and charged with DWI and having a blood alcohol concentration of .10 or more. He submitted to a Breathalyzer test, which revealed a blood alcohol content of .22. At that time he was given a notice and order of revocation of his driver's license. The notice and order also carried with it a temporary driver's permit valid for a seven-day period. On July 21, 1982, Heddan applied for and received a limited license from the Department of Public Safety. His limited license permitted him to drive from the hours of 8 a.m. through 6 p.m. six days per week, Monday through Saturday.

On July 21, 1982, Heddan also filed his request for judicial review and administrative review. On that date he appeared with counsel before a driver evaluator as part of his administrative review. Heddan submitted a petition generally denying each of the elements of the revocation, but asserted his privilege against self-incrimination and refused to give a statement or fill out and sign the form distributed by the Department of Public Safety for obtaining review. On July 27, 1982, the Commissioner of Public Safety sent notice to Heddan informing him that he found sufficient basis to sustain the revocation.

On August 16, 1982, Heddan had a judicial review hearing before a municipal court referee. Counsel for Heddan moved to dismiss the revocation order on grounds that the judicial review as to be heard by a court referee and that the proceedings violated his Fifth Amendment rights. The motion was denied. The revocation of Heddan's driving privileges was sustained at that time.

On July 3, 1982, Paul William Lundberg was stopped by Minneapolis police officers and subsequently charged with DWI and having a blood alcohol concentration of .10 or more. He submitted to a Breathalyzer test which revealed a .10 blood alcohol content. At that time he was given a notice and order of revocation of his driver's license. The notice and order also carried with it a temporary driver's permit valid for a seven-day period. Lundberg applied for and was issued a limited license on July 20, 1982. He filed his request for judicial and administrative review on July 26, 1982.

Lundberg appeared for administrative review before a driver evaluator on August 4, 1982. He submitted a petition generally denying each of the elements of the revocation, but asserted his privilege against self-incrimination and refused to give a statement or fill out and sign the form distributed by the Department of Public Safety for obtaining review. Lundberg was represented by counsel, who argued that a .10 reading was inherently defective. On or about August 15, 1982, the Commissioner of Public Safety sent Lundberg notice that he found sufficient basis to sustain the revocation.

On August 4, 1982, Lundberg reapplied for and received a limited license, as the one

he had obtained earlier, on July 20, 1982, was for a 30-day period and was due to expire in August. He was, the same day, reissued a limited license which permitted him to drive between the hours of 7 a.m. and 5 p.m. Monday through Friday.

On August 19, 1982, a judicial review hearing was scheduled in the Lundberg case. At that time the state requested a continuance to September 30, 1982, as the arresting officer and Breathalyzer test operator were unavailable. Over objection, the referee granted the continuance, but ordered the Department of Public Safety to reinstate Lundberg's full driving privileges effective August 19, 1982, pending the hearing. The judicial hearing was then rescheduled to September 30, 1982. After the hearing Lundberg's revocation was rescinded. The referee reasoned that the closeness of the reading, together with the failure of the police to follow the Bureau of Criminal Apprehension (BCA) recommended steps to avoid radio frequency interference, dictated in favor of the driver. He therefore held that the state failed to meet its burden of proof by a preponderance of the evidence that the test result was accurate and reliable.

On July 15, 1982, Craig Sheridan Miller was stopped by Minneapolis police and charged with DWI and having a blood alcohol concentration of .10 or more. He submitted to a Breathalyzer test, which revealed a blood alcohol content of .16. At that time he was given a notice and order of revocation of his driver's license. The notice and order carried with it a temporary driver's permit valid for a seven-day period. On July 26, 1982, Miller requested administrative and judicial review. He submitted a petition generally denying each of the elements of the revocation, but asserted his privilege against self-incrimination and refused to give a statement or fill out the form distributed by the Department of Public Safety for obtaining review. He also applied for a limited license. Miller was denied a limited license because he was not employed at that time. Present employment is a prerequisite for obtaining a limited license.

Miller appeared July 30, 1982, before a driver evaluator for administrative review and was represented by counsel. His counsel argued that the Minneapolis Police Department's failure to use the BCA 21-point checklist was a fatal defect in the revocation.

After Miller filed his request for administrative review the Department of Public Safety attempted to obtain from the Minneapolis Police Department copies of the implied consent advisory, notice and order of revocation and temporary license. Although a police incident report was forwarded to the Department of Public Safety, these other documents were not. The documents were located by the Minneapolis Police Department on August 10, 1982, which was 15 days from the request for administrative review. However, they were not received by the Department until after the 15-day period had elapsed.

On August 13, 1982, Miller's driving privileges were reinstated as a result of the findings of the administrative review. The order of the Commissioner of Public Safety revoking Miller's driving privileges was overruled because the Department of Public Safety had not received from the Minneapolis Police Department information or reports sufficient to sustain the review within the 15-day required time period.

*Overview of the Implied Consent Law*

The question presented by this appeal is whether Minn.Stat. § 169.123 (1982), which mandates suspension of a driver's license because of a refusal to take a chemical test for alcohol concentration or failure of a chemical test by registering an alcohol concentration of .10 or more, is violative of due process or the privilege against self-incrimination.

The elements of an implied consent violation are clearly defined by the statute:

> Subd. 2. *Implied consent; conditions; election as to type of test.* (a) Any person who drives, operates or is in physical control of a motor vehicle within this state consents, subject to the provisions

of this section and section 169.121, to a chemical test of his blood, breath, or urine for the purpose of determining the presence of alcohol or a controlled substance. The test shall be administered at the direction of a peace officer. *The test may be required of a person when an officer has reasonable and probable grounds to believe the person was driving, operating, or in physical control of a motor vehicle in violation of section 169.-121 and one of the following conditions exist: (1) the person has been lawfully placed under arrest for violation of section 169.121, or an ordinance in conformity therewith; or (2) the person has been involved in a motor vehicle accident or collision resulting in property damage, personal injury, or death; or (3) the person has refused to take the screening test provided for by section 169.121, subdivision 6; or (4) the screening test was administered and recorded an alcohol concentration of 0.10 or more.* No action may be taken against the person for declining to take a direct blood test, if offered, unless an alternative test was offered.

Minn.Stat. § 169.123, subd. 2(a) (1982) (emphasis added).

The statute goes on to require that when requesting a test, the peace officer must notify the driver of the consequences of a decision to test or not test. Minn.Stat. § 169.123, subd. 2(b) (1982).

A final element in implied consent procedure is that a peace officer must afford the driver a reasonable opportunity to consult counsel before opting to test or not test. This requirement was established by this court in *Prideaux v. State, Commissioner of Public Safety,* 310 Minn. 405, 247 N.W.2d 385 (1976).

Administrative revocations under the implied consent law are 90 days for test failures and 6 months for test refusals. Minn. Stat. § 169.123, subd. 4 (1982). The law is designed to encourage the taking of tests and to remove suspected and certifiable drunken drivers from the road. Under the system in effect prior to July 1, 1982, a driver was given a 30-day temporary license with the notice of revocation. Minn.Stat. § 169.123, subd. 5a (1980). The driver then had the right to appeal the license revocation by requesting a judicial hearing. If the driver did appeal, he was issued a temporary license until a final determination on the revocation was made. Minn.Stat. § 169.123, subd. 5a (1980). If no appeal was requested, the revocation became effective at the end of the 30-day period.

This system resulted in approximately one request for judicial review out of every three implied consent violations reported. During 1981, of the approximately 33,000 implied consent violations reported, there were approximately 10,500 requests for judicial review. Out of these 10,500 requests for review, 326 drivers were able to avoid license revocation.

During the 1982 legislative session Minn. Stat. § 169.123 was amended in order to reduce the time lapse between an implied consent violation and the imposition of license revocation. The old law delayed all revocations for 30 days from the notice of revocation. The new law provides just 7 days. Minn.Stat. § 169.123, subds. 5 and 5a (1982). The old law enabled additional delay by a request for judicial review. The new amendments provide that "[t]he filing of the petition shall not stay the revocation or denial." Minn.Stat. § 169.123, subd. 5c (1982).

While removing the opportunity for lengthy delay, the 1982 amendments simultaneously created a more efficient system for obtaining review of the revocation order. The amendments provided for two distinct avenues of review: administrative review by the Department of Public Safety, and judicial review in a county or municipal court.

The administrative review mechanism is entirely new. The statute provides as follows:

> *Administrative review.* At any time during a period of revocation imposed under this section a person may request in writing a review of the order of revocation by the commissioner of public safe-

ty. Upon receiving a request the commissioner or his designee shall review the order, the evidence upon which the order was based, and any other material information brought to the attention of the commissioner, and determine whether sufficient cause exists to sustain the order. Within 15 days of receiving the request the commissioner shall report in writing the results of his review. The review provided in this subdivision is not subject to the contested case provisions of the administrative procedure act in sections 14.01 to 14.70.

The availability of administrative review for an order of revocation shall have no effect upon the availability of judicial review under this section.

Minn.Stat. § 169.123, subd. 5b (1982). This provision contemplates an informal review procedure which is designed to remedy obvious errors. The procedure is speedy, promising a result within 15 days, and it accords a certain measure of due process to subjects of revocation orders.

Drivers requesting administrative review are asked to fill out an administrative review form setting forth facts pertaining to why the revocation is not valid. Drivers are then asked to sign the form, have it notarized, and submit it to the commissioner. Each numbered paragraph of the form sets forth an element of the implied consent violation and solicits the driver's version of the facts pertaining to that element.

Administrative reviews are conducted by civil service employees known as "driver safety analysts." All employees in this classification have past experience with the laws and rules governing license revocation. They have also undergone training in administrative review and in the legal principles in this area.

In addition to the written request for review, drivers may appear in person for administrative review on any business day in St. Paul or at regularly scheduled times in locations throughout the state. Counsel may appear with the driver, although there are no provisions for subpoenaing or cross-examining witnesses.

In conducting an administrative review, the review officer considers information provided by the driver and all relevant reports provided by law enforcement agencies. The review officer reports his findings to the driver within *15 days* of request for review. The report includes findings on each element of the offense. Within 30 days following receipt of the notice and order of revocation a person may petition the court for judicial review. Minn.Stat. § 169.123, subd. 5c (1982). This may be done while pursuing administrative review.

The judicial review provision, as amended in 1982, requires that a hearing be conducted "at the earliest practicable date," and in no event later than 60 days after the filing of a petition for judicial review. Minn.Stat. § 169.123, subd. 6 (1982). Judicial district administrators are directed to implement this requirement through efficient scheduling and the transfer of cases within their districts to expedite hearings. Court administrators in the 10 Minnesota judicial districts have established a scheduling system for implied consent cases whereby judicial review will normally be had from within 10 to 40 days following the filing of a petition.

Appellants raise the following issues on this appeal:

(1) Whether the prehearing license revocation provisions of Minn.Stat. § 169.123 (1982) violate due process of law as guaranteed by the United States and Minnesota Constitutions.

(2) Whether Minn.Stat. § 169.123 (1982) compels persons to incriminate themselves in violation of their Fifth Amendment privilege against self-incrimination.

■ 1. Procedural due process imposes constraints on governmental decisions which deprive individuals of "liberty" or "property" interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendments of the United States Constitution and Article I, Section 7, of the Minnesota Constitution.

A license to drive is an important property interest. *Bell v. Burson,* 402 U.S. 535,

539, 91 S.Ct. 1586, 1589, 29 L.Ed.2d 90 (1971). The state does not dispute that appellants' licenses are property interests subject to due process protection; rather, it concludes that the existing procedures, as previously discussed, provide all the process that is constitutionally due before a driver can be deprived of his license.

The United States Supreme Court has consistently held that some form of hearing is required before an individual is finally deprived of a property interest. *Wolff v. McDonnell*, 418 U.S. 539, 557–558, 94 S.Ct. 2963, 2975–2976, 41 L.Ed.2d 935 (1974). The fundamental requirement of due process is the opportunity to be heard "at a meaningful time and in a meaningful manner." *Armstrong v. Manzo*, 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62 (1965). "[D]ue process is flexible and calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972).

█ The resolution of the issue of whether the procedures provided under Minn. Stat. § 169.123 (1982) are constitutionally sufficient requires analysis of the governmental and private interests that are affected. In *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976), the Supreme Court stated that identification of the specific dictates of procedural due process requires the consideration of three distinct factors:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

The United States Supreme Court faced the due process question presented by a prehearing implied consent license revocation in *Mackey v. Montrym*, 443 U.S. 1, 99 S.Ct. 2612, 61 L.Ed.2d 321 (1979). *Montrym* involved a class action challenge to the Massachusetts implied consent system. The Massachusetts system is similar to the new Minnesota system in most respects, but distinguishable in some.

The license revocation in Massachusetts, unlike Minnesota, is only for test refusals. The revocation is based upon a report from a peace officer to the state licensing agency, and takes immediate effect upon issuance.

The post-revocation review system in Massachusetts, like Minnesota, provides multiple levels of review. The first is an appearance before the Registrar of Motor Vehicles. Massachusetts Gen.Laws Ann. ch. 90, § 24(1)(g) (West 1975). This appearance is available immediately and a decision is apparently available within 2 to 10 days. 443 U.S. at 7–8, n. 5, 99 S.Ct. at 2615–2616, n. 5. An appeal is provided to a more formal administrative body known as the Board of Appeal. The Massachusetts statute does not specify how soon this hearing must be held or when a decision must be rendered. Massachusetts Gen.Laws Ann., ch. 90, § 28 (West 1975).

The United States Supreme Court examined the Massachusetts implied consent system under the due process analysis used in *Mathews v. Eldridge, supra*. The *Montrym* court concluded "that the compelling interest in highway safety justifies the Commonwealth in making a summary suspension effective pending the outcome of the prompt postsuspension hearing available." 443 U.S. at 19, 99 S.Ct. at 2621. A comparison of the Minnesota and Massachusetts prehearing revocation systems employing the *Eldridge* factors shows that the Minnesota system is not significantly distinguishable from that of Massachusetts.

The three factors employed by the *Montrym* court were: (1) the nature and weight of the private interest affected by the official action challenged; (2) the likelihood of erroneous deprivation of the private interest involved as a consequence of the procedures used; and (3) the state interests served by the summary procedures used, as

well as the administrative and fiscal burden that would result from substitute procedures sought. We will examine the Minnesota and Massachusetts implied consent systems using each of these factors.

## A. *The private interest*

The private interest affected here is the same as in *Montrym,* the granted license to operate a motor vehicle, or more particularly, the driver's interest in continued possession and use of the license pending the outcome of a hearing. The court in *Dixon v. Love,* 431 U.S. 105, 97 S.Ct. 1723, 52 L.Ed.2d 172 (1977), recognized this interest as a substantial one, particularly in light of the fact that the state will be unable to make a driver whole for any personal inconvenience and economic hardship suffered by reason of an erroneous suspension.

The *Montrym* court indicated that the actual weight given the private interest depends upon three factors: (1) the duration of the revocation; (2) the availability of hardship relief; and (3) the availability of prompt post-revocation review. 443 U.S. at 11–12, 99 S.Ct. at 2617–2618.

The United States Supreme Court upheld prehearing revocations of driver's licenses in *Montrym* and the Illinois case of *Dixon v. Love, supra.* In *Montrym* the suspension was for a maximum period of 90 days. In *Love* the suspension could be for as long as one year (or more). The Minnesota revocation falls between those of Massachusetts and Illinois: 6 months for test refusals and 90 days for test failures. This factor does not distinguish this case from *Montrym* or *Love,* which upheld prehearing revocations.

The Minnesota implied consent system contains provisions for hardship relief unavailable under the Massachusetts statute. In Minnesota a driver automatically receives a 7-day temporary license at the time of revocation. Minn.Stat. § 169.123, subd. 5a (1982). In addition, the Minnesota statute provides for the issuing of limited licenses to drivers whose licenses have been revoked under certain conditions. A limited license is generally available immediately upon application by a first offender and

during the second half of the revocation period for one whose license has been revoked twice within 5 years. The licenses are generally limited to use for employment or alcohol rehabilitation purposes. The availability of hardship relief in Minnesota and the lack thereof in Massachusetts are significant factors favoring the Minnesota system.

The final factor in weighing the affected private interest under the *Montrym* analysis is the availability of prompt post-revocation review. In Minnesota and Massachusetts post-revocation review is available in two forms. Informal administrative review is available immediately in both states. In each state it is conducted by an employee of the state licensing agency. A driver may be represented by counsel under both procedures, but in Massachusetts, unlike Minnesota, witnesses may testify and be cross-examined. In Massachusetts the decision is usually available in one or two days, but no later than 10 days after the hearing. In Minnesota, the decision is issued no later than 15 days after a written request for a review of the revocation. Minn.Stat. § 169.123, subd. 5b (1982).

A more formal and complete review is also available in both states. In Minnesota that review is conducted by a municipal or district court, Minn.Stat. § 169.123, subd. 6 (1982), while in Massachusetts it is conducted by an administrative board of appeal. In Massachusetts there is no statutory requirement on the timeliness of this hearing. The plaintiff in *Montrym* had a hearing scheduled before the Board of Appeal 29 days after revocation. In Minnesota Minn. Stat. § 169.123, subd. 6, requires that the hearing be conducted at "the earliest practicable date, and in any event no later than 60 days following the filing of the petition for review." The differences between the Massachusetts and Minnesota systems of post-revocation review do not appear to favor either system to any constitutionally significant degree.

This analysis of the three factors which the *Montrym* court considered significant in weighing the private interest leads us to

the conclusion that, although the interest in a driver's license is a substantial one, the length of revocation, the availability of prompt post-revocation relief and, most importantly, the availability of hardship relief result in a private interest of no more weight than that in *Montrym.*

### B. *Risk of erroneous deprivation*

The second factor considered in the *Montrym* analysis for a prehearing license revocation is the likelihood of an erroneous deprivation of the private interest involved. In describing this factor the *Montrym* court stated:

> And, although this aspect of the *Eldridge* test further requires an assessment of the relative reliability of the procedures used and the substitute procedures sought, *the Due Process Clause has never been construed to require that the procedures used to guard against an erroneous deprivation of a protectible "property" or "liberty" interest be so comprehensive as to preclude any possibility of error.* The Due Process Clause simply does not mandate that all governmental decisionmaking comply with standards that assure perfect, error-free determinations. *Greenholtz v. Nebraska Penal Inmates, supra,* [442 U.S. 1] at 7 [99 S.Ct. 2100, at 2103]. Thus, even though our legal tradition regards the adversary process as the best means of ascetaining truth and minimizing the risk of error, the "ordinary principle" established by our prior decisions is that "something less than an evidentiary hearing is sufficient prior to adverse administrative action." *Dixon v. Love, supra* [431 U.S.] at 113 [97 S.Ct. at 1728]. And, when prompt postdeprivation review is available for correction of administrative error, *we have generally required no more than that the predeprivation procedures used be designed to provide a reasonably reliable basis for concluding that the facts justifying the official action are as a responsible governmental official official warrants them to be.*

443 U.S. at 13, 99 S.Ct. at 2618 (emphasis added).

In both Minnesota and Massachusetts a driver's license is revoked in cases where a peace officer had probable cause to believe the person had been operating a motor vehicle while under the influence of alcohol and that person refused to submit to chemical testing. The *Montrym* court did not regard the risk of erroneous deprivation as significant in these cases, stating:

> [T]he risk of erroneous observation or deliberate misrepresentation of facts by the reporting officer in the ordinary case seems insubstantial.

443 U.S. at 14, 99 S.Ct. at 2619.

However, Minnesota also revokes the license of a driver who fails a chemical test, while Massachusetts does not. Appellants strongly assert that the risk of erroneous deprivation of a license to drive due to the "infinite possibilities for error" inherent in testing for blood alcohol concentration is the most significant difference in the Minnesota and Massachusetts systems. Appellants particularly challenge the reliability of Breathalyzer testing, which is the test given in most cases. Minn.Stat. § 169.123, subd. 2 (1982).

This court has previously considered the reliability of Breathalyzer testing. In *State v. Quinn,* 289 Minn. 184, 186, 182 N.W.2d 843, 845 (1971), we stated:

> It is generally held that the alcoholic content of the blood may be reliably determined by such a test, and testimony of the reading obtained upon a properly conducted test may be admitted without antecedent expert testimony that the reading is a trustworthy index of alcohol in the blood.

(Citations omitted.)

Three experts testified for the state as to the accuracy and reliability of the Breathalyzer test. Mr. Richard Prouty, Chief Forensic Toxicologist, Office of Medical Examiner, State of Oklahoma, noted that:

> [T]he Breathalyzer and its various models are and have been internationally accepted and recognized as a reliable evidentiary device for determining blood alcohol content.

Mr. Lowell Van Berkom, BCA Laboratory Director, stated:

> [T]he use of the Breathalyzer Model 900 and 900A in accordance with this Breathalyzer operational checklist 21-step procedure provide a highly accurate and scientifically acceptable result of breath analysis for alcohol.

Mr. Phillip L. Neese, supervisor of the chemical testing unit for the Minneapolis Police Department, noted that "the Breathalyzer was an accurate instrument, but that the readings were slightly *lower* than blood tests." (Emphasis added.)

On September 10, 1982, Smith & Wesson Corporation, the manufacturer of the Breathalyzer Models 900 and 900A, which are the exclusive breath-testing apparatuses in Minnesota, issued an advisory to all of its customers concerning radio frequency interference (RFI). The advisory informed Smith & Wesson's customers that "continuing investigation now suggests this early series of breath testing instruments may be affected in an unpredictable manner by various frequencies and power levels." This advisory was a culmination of substantial testing by Smith & Wesson and an independent third party.

At trial Mr. Herb Belin, product manager of Smith & Wesson, testified that the Model 900 was not susceptible to RFI, and testing by the BCA confirmed this. Belin further testified that their investigation failed to show any problem "due to anything other than the contrived RF fields generated by our own equipment at our own demand." The BCA has field-tested all Breathalyzers in Minnesota for RFI. Each and every Breathalyzer presently in operation in Minnesota has been field-tested and certified not to be affected by RFI in the location in which it is operating.

The trial court found that:

> Breath testing in Minnesota at certified locations in accordance with the BCA protocol, merits the highest confidence and remains a reliable and accurate means of measuring alcohol concentration.

The trial court's finding is not clearly erroneous. While the risk of erroneous depriva-

tion is greater under the Minnesota statute than under Massachusetts law, it is not to such a degree as to alter the balance struck by the Supreme Court in *Montrym*.

C. *The public interest served by prehearing revocation.*

The third and final factor from *Montrym* for determining the constitutionality of prehearing implied consent revocations is the public interest at stake. The *Montrym* court considered two public interests: the public interest in keeping roads and highways safe, and the public interest in avoiding fiscal and administrative burdens which are disproportionate to the nature of the private interest being revoked and to the risk of erroneous revocation.

The public interest in preserving the safety of our roadways is of great importance. As the court in *Montrym* noted:

> We have traditionally accorded the states great leeway in adopting summary procedures to protect public health and safety. States surely have at least as much interest in removing drunken drivers from their highways as in summarily seizing mislabeled drugs or destroying spoiled foodstuffs. [Citations omitted.]
>
> The Commonwealth's interest in public safety is substantially served in several ways by the summary suspension of those who refuse to take a breath-analysis test upon arrest. First, the very existence of the summary sanction of the statute serves as a deterrent to drunken driving. Second, it provides strong inducement to take the breath-analysis test and thus effectuates the Commonwealth's interest in obtaining reliable and relevant evidence for use in subsequent criminal proceedings. Third, in promptly removing such drivers from the road, the summary sanction of the statute contributes to the safety of public highways.

443 U.S. at 17–18, 99 S.Ct. at 2620–2621.

Statistics linking drunken driving with the tragedy of death and injury on our nation's highways abound. Forst Lowry, the Safety Program Coordinator for the Minnesota Department of Public Safety,

testified that in 1981 52% of the drivers killed in Minnesota had a blood alcohol concentration of .10 or more and 62% of drivers killed had some measurable alcohol concentration. It is estimated that in 1980 over 400 persons were killed in Minnesota because of drunken drivers and direct economic loss amounted to approximately $114 million.

The *Montrym* court determined, that the summary and automatic character of the suspension sanction available under the Massachusetts statute is critical to deterring drunken drivers and making the state's highways safer. 443 U.S. at 18, 99 S.Ct. at 2621. The prehearing revocation system also helps to ease fiscal and administrative burdens, a second area of public interest. As the *Montrym* court stated:

> A presuspension hearing would substantially undermine the state interest in public safety by giving drivers significant incentive to refuse the breath-analysis test and demand a presuspension hearing as a dilatory tactic. Moreover, the incentive to delay arising from the availability of a presuspension hearing would generate a sharp increase in the number of hearings sought and therefore impose a substantial fiscal and administrative burden on the Commonwealth. *Dixon v. Love,* 431 U.S., at 114 [97 S.Ct. at 1728].

443 U.S. at 18, 99 S.Ct. at 2621. Attorney General Warren Spannaus testified at trial that his office had estimated for the legislature overall annual savings of approximately $320,000 under the new system of prehearing revocation.

As the statistics cited above point out, drunken drivers pose a severe threat to the health and safety of the citizens of Minnesota. The compelling interest in highway safety justifies the State of Minnesota in making a revocation effective pending the outcome of the prompt post-suspension hearing.

■ 2. Appellants next contend that Minn.Stat. § 169.123 (1982) imposes a penalty on them for exercising their privilege against self-incrimination, and thereby violates the Fifth Amendment to the United States Constitution and Article I, Section 7, of the Minnesota Constitution. The trial court determined that "the availability of expeditious administrative and timely judicial review under the system devised by the Commissioner of Public Safety does not result in a violation of a plaintiff's Fifth Amendment privilege against self-incrimination."

In any DWI case, the defendant faces two types of penalties in two separate proceedings: (1) criminal penalties under Minn. Stat. § 169.121 and (2) civil license revocation under Minn.Stat. § 169.123. Under Minn.Stat. § 169.123 the driver's license is revoked prior to a hearing. The driver may then request administrative or judicial review of the revocation. The driver has a high incentive to request review immediately since his or her license has already been revoked. Meanwhile, if the driver pleads not guilty to the criminal charges, he will be seeking license revocation review while the criminal charges are pending. Statements made to the administrator in the administrative review or to the court in judicial review are not immunized by law, and thus may be used against the driver in the later criminal case. In fact, the form which a driver must submit in order to attain administrative review states that the information given in the form may be used in any related court action. Appellants contend that this puts the driver in an untenable position where he must choose between testifying during the license revocation hearing and risking the later use of the testimony in the criminal case, or refusing to testify and thus forgoing the right to fully litigate the license revocation.

There is no doubt that appellants have the right to assert their Fifth Amendment privilege against self-incrimination in either the administrative or judicial hearing if it can be "reasonably apprehend[ed]" that the statements could be used against them in a criminal prosecution. *Murphy v. Waterfront Commission,* 378 U.S. 52, 94, 84 S.Ct. 1594, 1611, 12 L.Ed.2d 678 (1964). That is not the question before us, however. Appellants contend that the handicap which

they would be placed under if they assert the privilege is a constitutional violation. The question before this court is, therefore, whether the procedure under Minn.Stat. § 169.123 impermissibly burdens appellants' exercise of their Fifth Amendment rights.

In *South Dakota v. Neville*, —— U.S. ——, 103 S.Ct. 916, 74 L.Ed.2d 748 (1983), the United States Supreme Court recently held that the admission into evidence of a defendant's refusal to submit to a blood alcohol test does not offend his Fifth Amendment right against self-incrimination.[1] The court held that the refusal was not *compelled* and, therefore, not protected by the privilege against self-incrimination. In discussing the requirement that the defendant must be compelled to testify against himself in order to invoke his Fifth Amendment privilege, the *Neville* court stated:

> As we stated in *Fisher v. United States*, 425 U.S. 391, 397 [96 S.Ct. 1569, 1574, 48 L.Ed.2d 39] (1976), "[T]he Court has held repeatedly that the Fifth Amendment is limited to prohibiting the use of 'physical or moral compulsion' exerted on the person asserting the privilege." This coercion requirement comes directly from the constitutional language directing that no person "shall be *compelled* in any criminal case to be a witness against himself." U.S. Const., Amdt. 5 (emphasis added). And as Professor Levy concluded in his history of the privilege, "[t]he element of compulsion or involuntariness was always an ingredient of the right and, before the right existed, of protests against incriminating interrogatories." W. Levy, Origins of the Fifth Amendment 328 (1968).

> Here, the state did not directly compel respondent to refuse the test, for it gave him the choice of submitting to the test or refusing. Of course, the fact the government gives a defendant or suspect a "choice" does not always resolve the compulsion inquiry. The classic Fifth

Amendment violation—telling a defendant at trial to testify—does not, under an extreme view, compel the defendant to incriminate himself. He could submit to self accusation, or testify falsely (risking perjury) or decline to testify (risking contempt). But the Court has long recognized that the Fifth Amendment prevents the state from forcing the choice of this "cruel trilemma" on the defendant. See *Murphy v. Waterfront Commission*, 378 U.S. 52, 55 [84 S.Ct. 1594, 1596, 12 L.Ed.2d 678] (1964). See also *New Jersey v. Portash*, 440 U.S. 450, 459 [99 S.Ct. 1292, 1297, 59 L.Ed.2d 501] (1979) (telling a witness under a grant of legislative immunity to testify or face contempt sanctions is "the essence of coerced testimony."). Similarly, *Schmerber* cautioned that the Fifth Amendment may bar the use of testimony obtained when the profferred alternative was to submit to a test so painful, dangerous, or severe, or so violative of religious beliefs, that almost inevitably a person would prefer "confession." *Schmerber* [*v. California*], 384 U.S. [757] at 765, n. 9 [86 S.Ct. 1826, at 1833, n. 9, 16 L.Ed.2d 908]. Cf. *Miranda v. Arizona*, 384 U.S. 436, 458 [86 S.Ct. 1602, 1619, 16 L.Ed.2d 694] (1966) (unless compulsion inherent in custodial surroundings is dispelled, no statement is truly a product of free choice).

—— U.S. at ——, 103 S.Ct. at 922 (footnote omitted).

The court concluded that:

We recognize, of course, that the choice to submit or refuse to take a blood-alcohol test will not be an easy or pleasant one for a suspect to make. But the criminal process often requires suspects and defendants to make difficult choices. See, *e.g.*, *Crampton v. Ohio*, decided with *McGautha v. California*, 402 U.S. 183, 213–217 [91 S.Ct. 1454, 1470–1472, 28 L.Ed.2d 711] (1971).

---

1. It should be noted that after July 31, 1983, Minn.Stat. § 169.121, subd. 2(5), allows for the admission into evidence of a defendant's refusal to take a chemical test for determining the presence of alcohol or a controlled substance. Prior procedure is discussed in *State v. Willis*, 332 N.W.2d 180 (Minn.1983).

—— U.S. at ——, 103 S.Ct. at 923. Although the appellants in the case at bar were faced with such a difficult choice, that choice does not rise to the level of compulsion necessary in order to constitute a Fifth Amendment violation.

Appellants' contention that Minn.Stat. § 169.123 violates their privilege against self-incrimination is primarily based upon their claim that a person seeking administrative review must complete and sign the form distributed by the Department of Public Safety entitled "Request for Administrative Review of Implied Consent Revocation." Completion of the form is not required by statute. *See* Minn.Stat. § 169.-123, subd. 5b. The Department of Public Safety does not require that its form be completed in order to obtain administrative review. None of the parties to this action completed or signed the Department of Public Safety form and each had an administrative review of his license revocation. In fact, appellant Miller's driving privileges were reinstated as a result of his administrative review hearing. Furthermore, the state has the burden of proving each element of the implied consent violation in order to sustain the license revocation. This factor has been considered significant in determining whether a person is compelled to testify. *See United States v. U.S. Currency,* 626 F.2d 11 (6th Cir.), *cert. denied,* 449 U.S. 993, 101 S.Ct. 529, 66 L.Ed.2d 290 (1980).

The record in this case is devoid of any evidence of appellants' being compelled to give incriminating evidence in order to obtain review of their license revocations. Appellants need merely request review and indicate a basis for reversal. They need provide no other information to have their challenge heard. The trial court was correct in its determination that Minn.Stat. § 169.123 does not compel persons to incriminate themselves in violation of their federal and state constitutional privilege against self-incrimination.

Finally, appellants have failed to satisfy 42 U.S.C. § 1983's threshold requirement that the plaintiff be deprived of a right

"secured by the Constitution and laws," and therefore they have no cognizable claims under § 1983. *Baker v. McCollan,* 443 U.S. 137, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979).

Affirmed.

YETKA, Justice (concurring specially).

While I concur in the result, I find it unnecessary to decide that the information requested in the pre-administrative review form is not violative of the privilege against self-incrimination. The form is not authorized by statute and I would hold that the information requested, if given, is not usable in a criminal proceeding. Such a holding would make the administrative hearing more meaningful and open because the driver would be more likely to tell his complete story, thus resulting in fewer court-contested cases.

WAHL, Justice (concurring specially).

I join the concurrence of Justice YETKA.