STATE OF NORTH CAROLINA v. CYNTHIA WALLACE SHUPING

No. 501PA84

(Filed 4 December 1984)

**Automobiles and Other Vehicles § 126.3— driving while impaired—breathalyzer results—deviation allowance**

There was sufficient evidence to submit the offense of driving with a blood alcohol content of .10 to the jury when defendant's test results were .10 and the breathalyzer registered .09 in simulator tests with a known solution of .10 alcohol because a deviation above .10 is not permitted. Thus, the .01 deviation allowance only allows error in favor of defendant. G.S. 20-138.1; 20-16.2; 20-4.01; 20-139.1.

BEFORE *Freeman, J.,* presiding at the 12 March 1984 Criminal Session, MOORE County Superior Court, defendant was found guilty of the offense of driving while impaired. From judgment entered on the jury verdict, defendant in open court gave notice of appeal to the Court of Appeals. This Court, pursuant to G.S. 7A-31(a) and Rule 15(e)(2) of the Rules of Appellate Procedure, allowed *ex mero motu* discretionary review prior to a determination by the Court of Appeals.

*Rufus L. Edmisten, Attorney General, by Isaac T. Avery, III, Special Deputy Attorney General; W. Dale Talbert, and David Roy Blackwell, Assistant Attorneys General, for the State-appellee.*

*Pollock, Fullenwider, Cunningham & Patterson, P.A., by Bruce T. Cunningham, Jr., for defendant-appellant.*

FRYE, Justice.

Defendant raises a question of first impression in this State relating to the offense of driving while impaired (DWI) pursuant to G.S. 20-138.1 (1983). Essentially, defendant contends that there was insufficient evidence to submit the 0.10 *per se* offense to the jury because the breathalyzer test results are inaccurate since they are subject to a 0.01 percent margin of error. This Court does not agree with defendant and affirms the judgment of the trial court.

On 6 October 1983, Officer R. T. Williams of the Southern Pines Police Department first saw defendant, Cynthia Wallace Shuping, at 10:45 p.m. at the Southern Pines Police Department where she was obtaining a warrant for the arrest of her ex-boyfriend. At that time, Officer Williams observed that defendant's speech was slurred; she appeared confused; she was staggering; and she had a moderate odor of alcohol on her breath. After defendant left the police department, Officer Williams observed her as she was driving along Pennsylvania Avenue. Defendant's vehicle crossed the center line and brushed the curb on the bridge on West Pennsylvania Avenue. Thereafter, the officer signaled with his siren and blue light and stopped the defendant. The defendant was unable to successfully perform some field dexterity-sobriety tests, and she was placed under arrest for driving while impaired. She was taken to the police department

where she was advised of her rights, before being given a breath-alyzer test.

Officer Kenneth Thornton of the Southern Pines Police Department administered a test of the defendant's breath using the Smith and Wesson Model 900A breathalyzer machine. The defendant's test revealed a 0.10 percent blood-alcohol concentration. During this time defendant stated to Officer Williams that she had begun drinking one glass of Creme de Menthe at approximately 8:00 p.m., stopping at approximately 10:00 p.m. She also stated that earlier during the evening she had taken prescription drugs consisting of Nardil, Navane and Xanax, all anti-depressants to calm her nerves.

During a jury trial in superior court, Officer Thornton, the breathalyzer operator, testified extensively about the proper procedure for administering the breathalyzer test given to the defendant. He testified that he had received training in the operation of the Model 900A and held the appropriate permit issued by the Department of Human Resources. He also testified that he followed the approved checklist when he performed the breathalyzer test on the defendant. During cross-examination, Officer Thornton testified in detail about the results of the simulator test conducted on the Model 900A prior to defendant's test, the simulator solution, and the practice of recording simulator results in a simulator master log. Officer Thornton further testified that the readings from simulator tests normally vary from 0.09 to 0.10 percent and that there is a permissible margin of tolerance of 0.01 percent below 0.10 percent. He also stated during re-direct examination that the rules require that a breathalyzer machine cannot be utilized to perform a test on an individual if the simulator test reading is greater than 0.10.

Defendant testified that she did not feel intoxicated and that she took the prescription drugs Navane and Nardil before going to the Southern Pines Police Department on the evening of 6 October 1983. She also testified that she was ignorant of any effects of taking prescription drugs and alcohol together.

I.

THE NEW STATUTE: IMPAIRED DRIVING

The offense of driving while impaired is defined as follows:

Impaired driving.

(a) Offense.—A person commits the offense of impaired driving if he drives any vehicle upon any highway, any street, or any public vehicular area within this State:

(1) While under the influence of an impairing substance; or

(2) After having consumed sufficient alcohol that he has, at any relevant time after the driving, an alcohol concentration of 0.10 or more.

N.C. Gen. Stat. § 20-138.1 (1983).

Prior to the enactment of G.S. 20-138.1, North Carolina law provided:

Persons under the influence of alcoholic beverages.

(a) It is unlawful and punishable as provided in G.S. 20-179 for any person who is under the influence of alcoholic beverages to drive or operate any vehicle upon any highway or any public vehicular area within this State.

(b) It is unlawful for any person to operate any vehicle upon any highway or any public vehicular area within this State when the amount of alcohol in such person's blood is 0.10 percent or more by weight . . . . An offense under this subsection shall be treated as a lesser included offense of the offense of driving under the influence.

N.C. Gen. Stat. § 20-138 (Cum. Supp. 1981).

Essentially, this statute made driving with a blood-alcohol concentration (BAC) of 0.10 percent or more a lesser included offense or separate method of proving the offense of driving while under the influence of intoxicants. Additionally, under former G.S. 20-139.1 the result of a chemical test yielding a 0.10 or greater created a presumption that the person was under the influence of intoxicating liquor. *State v. Basinger*, 30 N.C. App. 45, 226 S.E. 2d 216 (1976).

However, the 1983 Act created one substantive offense (DWI) but provided two methods of proving the offense: (1) that the State prove actual driver impairment; or (2) that the State prove only that the defendant operated a vehicle on a public highway or

public vehicular area with an alcohol concentration of 0.10 or more at any relevant time after the driving. The present statutory scheme does not depend upon a presumption. "The statute does not presume, it defines." *State v. Franco*, 96 Wash. 2d 816, 823, 639 P. 2d 1320, 1323 (1982); N.C. Gen. Stat. § 20-138.1 (1983).

The new DWI law represents an implied consent offense pursuant to G.S. 20-16.2 which states:

Implied consent to chemical analysis; mandatory revocation of license in event of refusal; right of driver to request analysis.

(a) Basis for Charging Officer to Require Chemical Analysis; Notification of Rights.—Any person who drives a vehicle on a highway or public vehicular area thereby gives consent to a chemical analysis if he is charged with an implied-consent offense . . . .

(a1) Meaning of Terms.—Under this section, an "implied-consent offense" is an offense involving impaired driving or an alcohol-related offense made subject to the procedures of this section.

The new act significantly amended the prior chemical testing statutes and enacted definitions governing chemical testing. The General Assembly plainly keyed the 0.10 theory of DWI to the results of a chemical analysis, which is defined in G.S. 20-4.01 as follows:

(3a) Chemical Analysis.—A chemical[1] test of the breath or blood of a person to determine his alcohol concentration, performed in accordance with G.S. 20-139.1. The term "chemical analysis" includes duplicate or sequential analyses when necessary or desirable to insure the integrity of test results.

The procedures governing the admissibility and performance of a chemical analysis are contained in G.S. 20-139.1. For our purposes, the relevant portions of this statute provide:

1. Amended by Ch. 1101, 1983 S.L., 1984, to delete the word "chemical" between the words "A" and "test."

(a) Chemical Analysis Admissible.—In any implied-consent offense under G.S. 20-16.2, a person's alcohol concentration as shown by a chemical analysis is admissible in evidence. This section does not limit the introduction of other competent evidence as to a defendant's alcohol concentration, including other chemical tests.

(b) Approval of Valid Test Methods; Licensing Chemical Analysts.—A chemical analysis, to be valid, must be performed in accordance with the provisions of this section. The chemical analysis must be performed according to methods approved by the Commission for Health Services by an individual possessing a current permit issued by the Department of Human Resources for that type of chemical analysis. The Commission for Health Services is authorized to adopt regulations approving satisfactory methods or techniques for performing chemical analyses, and the Department of Human Resources is authorized to ascertain the qualifications and competence of individuals to conduct particular chemical analyses. The Department may issue permits to conduct chemical analyses to individuals it finds qualified subject to periodic renewal, termination, and revocation of the permit in the Department's discretion.

The new statute, therefore, creates alternate methods of proving the crime of DWI. As defined by G.S. 20-138.1(a)(2), driving with a 0.10 percent BAC comprises one method of committing this crime. Additionally, the statute enables the State to introduce the results of a chemical analysis into evidence to prove the crime if the analysis comports with G.S. 20-139.1(b).

II.

BREATHALYZER RESULTS: DEFENDANT'S CHALLENGE

The defendant contends that there was insufficient evidence to submit the 0.10 aspect of G.S. 20-138.1 to the jury when the defendant's test results were 0.10 and the machine varies between 0.09 and 0.10 percent when the breathalyzer operator conducts the simulator tests. The defendant specifically excepted to the following charges given by the judge to the jury:

I would charge you that for you to find the defendant guilty of driving a vehicle on the highways of this State while

impaired the State of North Carolina must prove three things beyond a reasonable doubt. First, that the defendant was driving a 1973 Lincoln. Second, that she was driving that 1973 Lincoln upon a highway within this State, and I would say to you that East Pennsylvania Avenue in Southern Pines is a highway within this State. And third, that at the time the defendant was driving that '73 Lincoln she was either one, under the influence of an impairing substance; or, two, she was driving after having consumed sufficient quantity of alcohol that she had at any relevant time after driving an alcohol concentration of .10 or more.

. . . .

Now, the State also satisfies this third element of this offense if it proves beyond a reasonable doubt that the defendant was driving a vehicle on the highways of this State after having consumed sufficient alcohol that she had at any relevant time after driving an alcohol concentration of .10 or more.

The crux of defendant's argument originates with the testimony of Officer Thornton, the breathalyzer operator. Officer Thornton testified that he had been certified by the State to perform chemical analyses of the breath. He further testified that while conducting the breathalyzer tests on the defendant he complied with the Department of Human Resources' Regulations.[2] As part of these operational procedures, the operator is required to analyze a simulated breath sample prior to taking and analyzing the defendant's actual breath sample. The purpose of this procedure is to verify the accuracy of the machine. It is in the nature of a control test. To perform the simulator testing, the operator connects to the breathalyzer a jar containing a known solution of 0.10 percent alcohol.[3] The operator then blows into the mouth-

---

2. N.C. Admin. Code tit. 10, § 7B.0336 (1983).

3. N.C. Admin. Code, tit. 10, § 7B.0102 (defines simulator solution):

"Simulator Solution" shall mean a water-alcohol solution made by preparing a stock solution of 60.5 grams of alcohol per liter of water (77.0 ml. of absolute alcohol diluted to one liter of distilled water, or equivalent ratio) and then preparing for simulator use as a control sample by using 10 ml. of stock solution and further diluting to 500 ml. with distilled water, which then corresponds to the equivalent alcohol concentration of 0.10.

piece, introducing a sample of air from the simulator solution into the machine.[4]

If the machine yields the expected result of 0.10 percent then it is operating properly, since the control sample of air is being measured consistently with a prepared solution equal to 0.10 BAC. The regulations do allow for an instrumental deviation of 0.01 percent below the 0.10 expected reading. However, a deviation above the 0.10 percent expected reading is not permitted. *See* note 4, *supra.*

Officer Thornton testified that during the simulator test he obtained the result of 0.09, a reading on the low side. During cross examination, the defendant's attorney questioned the operator as follows:

Q. It's true, is it not, Mr. Thornton, the machine varies when you run the simulator test?

A. Yes, sir.

Q. What does it vary between?

. . . .

A. There is a tolerance.

Q. What is the tolerance?

A. Point 01.

Q. To what?

A. When I perform the test and I get results between .09 and .10 the instrument is working accurate.

---

4. N.C. Admin. Code tit. 10, § 7B.0102(22) defines this verification of instrumental calibration as follows:

Verification of Instrumental Calibration shall mean verification of instrumental accuracy by employment of a control sample from an alcoholic breath simulator using solution as specified in Paragraph (19) of this Rule and obtaining the expected results/level on the instrument. The expected results/level shall be an instrumental reading of 0.10 alcohol concentration, with an allowable instrumental deviation not to exceed 10 percent under the expected reading. Deviations on the high side are not permitted. When the procedures set forth for instruments in Section .0300 of these Rules are followed and the expected results/level is obtained, the instrument shall be deemed properly calibrated.

Q. So there is a ten per cent margin of error.

A. Point 01.

Q. Point 01 out of what?

A. Between .09 and .10.

Q. So if the machine registers anywhere between .09 and .10 for the simulator solution then you go ahead and run the test.

A. Yes, sir.

And during re-direct examination, Officer Thornton testified:

Q. Officer Thornton, you testified that—Mr. Cunningham asked you and you testified that the machine can be between .09 and .10 on the simulator and it's operating according to the guidelines, and you can run the Breathalyzer on certain subjects, is that correct?

A. Yes, sir.

Q. What happens if it's over .10?

A. You cannot use the instrument.

Q. Why is that?

A. It's not an accurate or valid test. The instrument is not working properly.

Q. And when you ran the simulator on Miss Shuping what were the test results?

A. The simulator test results?

Q. Yes.

A. .09.

Q. Is that within the tolerance, the guidelines set by the North Carolina Department of Human Resources, Division of Health Services?

A. Yes, Sir.

Defendant contends, based on this testimony, that there is a 0.01 "margin of error" in the breathalyzer instrument. Therefore,

it is contended defendant's BAC could have been 0.09, since her breathalyzer reading was 0.10 and the breathalyzer "varies up and down by 0.01." Basically, defendant argues that the 0.01 instrumental margin of tolerance allowed during simulator testing equates to a 0.01 "margin of error" during actual testing of the defendant's breath. This is simply not the case. The 0.01 deviation allowance below the expected reading of 0.10 during simulation procedures is a safeguard to insure that when the actual test is subsequently run, any possible error during actual testing is in favor of defendant. Stated differently, when the machine yields a 0.10 during simulation testing, the machine is operating accurately. A subsequent reading of the defendant's breath will then render a reading that is reliable.

Furthermore, when the machine yields a 0.09 during simulation testing, within the allowable margin of tolerance, that means it is testing on the low side. Thus, when a subsequent test is actually conducted on defendant, the reading from the machine is lower than the actual BAC. Thus, when defendant in this case blew a 0.10 after the machine had yielded a 0.09 during the simulation test, her actual BAC could have been a 0.11 rather than a 0.10. Consequently, any "error," if error there be, was fully in favor of defendant.

Defense counsel cites cases from sister states as persuasive authority to support his argument that readings from a breath-testing machine, in order to be competent evidence, must yield results outside of the 0.01 "margin of error" inherent in the testing process. Defendant contends that these cases recognize an "inherent deviation in the machine." Essentially, defendant maintains that the breathalyzer results must be 0.11 in order to prove a BAC of 0.10. Defendant's argument is rejected.

An analysis of the cases cited by defendant reveals that they are inapposite to the case *sub judice*. Two of these cases, *State v. Bjornsen*, 201 Neb. 709, 271 N.W. 2d 839 (1978) and *People v. Campos*, 138 Cal. App. 3d Supp. 1, 188 Cal. Rptr. 366 (Super. Ct. 1982), deal with the results of blood tests, not breath tests.[5] So instead, what these cases address is the error inherent in the blood-

5. It has been recognized that breathalyzer readings are usually lower than results from blood tests. *Heddan v. Dirkswager*, 336 N.W. 2d 54, 62 (Minn. 1983);

testing process, not the breath-testing machine involved in this case. Accordingly, we are not persuaded by this authority.

Defendant also cites *State v. Boehmer*, 613 P. 2d 916 (Hawaii Ct. App. 1980) (per curiam). It is true that in *Boehmer* the court concluded that the breathalyzer machine was subject to a margin of error. The court held that the results of the breathalyzer test must reflect a percent that is outside of any error inherent in the testing process. However, we are not persuaded by the court's rationale in *Boehmer*, primarily because the court relied exclusively upon *Bjornsen*, which dealt with blood, not breath, tests. Additionally, the *Boehmer* opinion does not make reference to any facts that indicate whether the breathalyzer operator was required to, or did indeed, verify the accuracy of the machine by conducting a simulator test prior to taking a sample of the defendant's breath.

Courts in several states have reviewed the accuracy and reliability of breath-testing devices, including the Breathalyzer Models 900 and 900A, and have determined them to be reliable scientific instruments. *Romano v. Kimmelman*, 96 N.J. 66, 474 A. 2d 1 (1984); *Heddan v. Dirkswager*, 336 N.W. 2d 54 (Minn. 1983); *People v. Tilley*, 120 Misc. 2d 1040, 466 N.Y.S. 2d 983 (Co. Ct. 1983); *State v. Keller*, 36 Wash. App. 110, 672 P. 2d 412 (1983); *State v. Rucker*, 297 A. 2d 400 (Del. Super. Ct. 1972).

In conclusion, we hold that the trial court correctly determined that the breathalyzer operator complied with the Department of Human Resources Regulations and the statutory provisions before admitting the chemical analysis of the defendant's breath into evidence pursuant to 20-139.1(a) and (b). *State v. Eubanks*, 283 N.C. 556, 196 S.E. 2d 706, *reh'g denied*, 285 N.C. 597 (1973). Once it is determined that the chemical analysis of the defendant's breath was valid, then a reading of 0.10 constitutes reliable evidence and is sufficient to satisfy the State's burden of proof as to this element of the offense of DWI. Therefore, the trial judge correctly instructed the jury regarding the 0.10 *per se* offense of DWI.

No error.

*see generally*, Watts, *Some Observations on Police-Administered Tests for Intoxication*, 45 N.C. L. Rev. 35, 51 (1966) (for a thorough treatment of the traditional chemical tests for intoxication).   ·