GARY RAYMOND HENRY v. RUFUS L. EDMISTEN, IN HIS OFFICIAL CAPACITY AS ATTORNEY GENERAL OF NORTH CAROLINA; J. RUSSELL NIPPER, IN HIS OF-FICIAL CAPACITY AS CLERK OF SUPERIOR COURT OF WAKE COUNTY; MAUDE P. HOCUTT, IN HER OFFICIAL CAPACITY AS A MAGISTRATE IN WAKE COUNTY; AND R. W. WILKINS, IN HIS OFFICIAL CAPACITY AS COMMISSIONER OF THE DIVISION OF MOTOR VEHICLES

STEVE HERROD BARBEE v. RUFUS L. EDMISTEN, IN HIS OFFICIAL CAPACITY AS ATTORNEY GENERAL OF NORTH CAROLINA; J. RUSSELL NIPPER, IN HIS OF-FICIAL CAPACITY AS CLERK OF SUPERIOR COURT OF WAKE COUNTY; AND R. W. WILKINS, IN HIS OFFICIAL CAPACITY AS COMMISSIONER OF THE DIVISION OF MOTOR VEHICLES

No. 550PA84

(Filed 18 February 1986)

1. Automobiles and Other Vehicles § 2.4— driving while impaired—failure of breath analysis test—ten-day license revocation—due process

The statute providing for a mandatory, prehearing ten-day license revoca-tion for drivers charged with an impaired driving offense who fail a breath analysis test, N.C.G.S. § 20-16.5, does not violate the Due Process Clause of the Fourteenth Amendment to the U. S. Constitution because the state's com-pelling interest in highway safety outweighs the private interests involved and any risk of erroneously depriving those interests and justifies the state's im-mediate suspension of a person's driver's license pending the outcome of prompt postsuspension review.

2. Constitutional Law § 23— prompt remedial action by state—law of the land

When the furtherance of a legitimate state interest requires the state to engage in prompt remedial action adverse to an individual interest protected by law and the action proposed by the state is reasonably related to furthering the state's interest, the law of the land ordinarily requires no more than that before such action is undertaken, a judicial officer determine there is probable cause to believe that the conditions which would justify the action exist.

3. Automobiles and Other Vehicles § 2.4; Constitutional Law § 23— driving while impaired—failure of breath analysis test—ten-day license revocation—Law of the Land Clause

The statute providing for a mandatory, ten-day license revocation for drivers charged with an impaired driving offense who fail a breath analysis test does not violate the Law of the Land Clause of Art. I, § 19 of the N. C. Constitution since the summary ten-day license revocation is a remedial measure reasonably related to the state's interest in highway safety and a detached and impartial judicial officer must scrutinize every condition of revocation to determine if there is probable cause to believe each condition has been met before revocation can occur.

4. **Automobiles and Other Vehicles § 2.4; Constitutional Law § 20— driving while impaired—failure of breath analysis test—ten-day license revocation—equal protection**

> The statute providing for a mandatory, ten-day license revocation for drivers charged with an impaired driving offense who fail a breath analysis test does not violate equal protection rights guaranteed by the state and federal constitutions because the legislature's decision to revoke at the time of arrest the licenses of probably impaired drivers but not other traffic offenders bears a rational relationship to the state's legitimate interest in highway safety.

5. **Automobiles and Other Vehicles § 2.4— driving while impaired—unlicensed driver—ten-day revocation—inapplicability to new license**

> The portion of N.C.G.S. § 20-16.5 providing that if the person is not currently licensed "the revocation continues until 10 days from the date the revocation order is issued and the person has paid the applicable costs" means that the revocation continues until the person has paid the applicable costs and at least ten days have elapsed from the date the revocation order is issued. The statute did not authorize the clerk of court to extend the revocation period to plaintiff's new license when he appeared to pay the restoration fee well after ten days from the date revocation of his license was ordered.

6. **Automobiles and Other Vehicles § 2.4; Criminal Law § 138.1— driving while impaired—summary revocation proceeding not punishment**

> The statute providing for a mandatory, ten-day license revocation for drivers charged with an impaired driving offense who fail a breath analysis test does not violate Art. XI, § 1, of the N. C. Constitution, which sets forth permissible punishments, since the summary revocation procedure of the statute is not a punishment but a highway safety measure.

> Justice BILLINGS took no part in the consideration or decision of this case.

ON discretionary review of a judgment entered by *Barnette, J.*, at the 4 October 1984 Civil Session of WAKE County Superior Court. We certified this cause for review prior to determination by the Court of Appeals pursuant to N.C.G.S. § 7A-31 and N.C. R. App. P. 15(e)(1).

*Van Camp, Gill and Crumpler, P.A., by William B. Crumpler and Sally H. Scherer for plaintiff appellees.*

*Lacy H. Thornburg, Attorney General, by Isaac T. Avery, III, Special Deputy Attorney General, for defendant appellants.*

EXUM, Justice.

The Safe Roads Act of 1983, 1983 N.C. Sess. Laws ch. 435, provides for a mandatory, prehearing ten-day license revocation

for drivers charged with an impaired driving offense who fail a breath analysis test. *Id.* at § 14 (codified at N.C.G.S. § 20-16.5 (1983)). The questions presented by this appeal are whether this statute violates (1) the Due Process and Equal Protection Clauses of the Fourteenth Amendment to the United States Constitution and (2) the corresponding Law of the Land and Equal Protection Clauses of Article I, section 19 of the North Carolina Constitution. Because we conclude that the state's compelling interest in public safety justifies the state's immediate suspension of a person's driver's license pending the outcome of prompt postsuspension review, we hold the statute does not violate the Due Process Clause. The statute also does not violate the Law of the Land Clause because a detached and impartial judicial officer must scrutinize every condition of revocation to determine if there is probable cause to believe each condition has been met before revocation can occur. Concluding that the revocation statute does not unreasonably single out for different treatment drivers who are charged with impaired driving offenses from drivers who are charged with other traffic offenses, we also hold the statute does not infringe equal protection rights.

I.

The Safe Roads Act (the "Act") provides:

A person's driver's license is subject to revocation under this section if:

(1) A law-enforcement officer has reasonable grounds to believe that the person has committed an offense subject to the implied-consent provisions of G.S. 20-16.2;

(2) The person is charged with that offense as provided in G.S. 20-16.2(a);

(3) The charging officer and the chemical analyst comply with the procedures of G.S. 20-16.2 and G.S. 20-139.1 in requiring the person's submission to or procuring a chemical analysis; and

(4) The person:

. . .

b. Has an alcohol concentration of 0.10 or more within a relevant time after the driving.

N.C.G.S. § 20-16.5(b) (1983).[1]

Other provisions of the Act provide as follows: If a person has an alcohol concentration of 0.10 or more within a relevant time after driving, the charging officer and a chemical analyst must execute a revocation report. § 16.5(c). The revocation report must contain a written statement of facts indicating each condition of revocation stated above has been met. § 16.5(a)(4). This revocation report must be filed with a judicial officer. § 16.5(d)(1).

After the revocation report is filed, the judicial officer upon the licensee's request must hold a hearing to determine if there is probable cause to believe that the conditions for revocation have been met. If the judicial officer determines that such probable cause exists, the judicial officer must enter an order revoking the person's driver's license. § 16.5(e). The revocation period begins at the time the revocation order is issued and continues until the person's license has been surrendered for ten days and the person has paid a $25 restoration fee unless the person is not currently licensed. In that case the revocation continues until ten days from the date the revocation order is issued and the person has paid the $25 fee. *Id.*

A person whose license has been revoked may request in writing a hearing to contest the validity of the revocation. The request for the hearing must specify the grounds upon which the validity of the revocation is challenged. A person specifically may request that the hearing be conducted by a district court judge. If the person does not request that the hearing be conducted by a district court judge, a magistrate conducts the hearing. The revocation remains in effect pending the hearing but the hearing must be held and completed within three working days following the request if the hearing is before a magistrate, or within five working days if the hearing is before a district court judge. § 16.5(g).

At the conclusion of the hearing, the presiding judicial officer must enter an order sustaining or rescinding the revocation. The decision of the judicial officer is final and may not be appealed in

---

1. All other statutes referred to in this opinion are in Chapter 20 of the General Statutes of North Carolina. Further statutory references will be to section numbers within Chapter 20.

the General Court of Justice. *Id.* Although appeal is prohibited, the presiding judicial officer may issue a modified order if he determines that an order has been issued improvidently. § 16.5(n).

License revocation proceedings are civil actions and must be identified by the caption "In the Matter of _____." § 16.5(o).

## II.

On 23 December 1983 plaintiff Gary Raymond Henry was arrested in Wake County and charged with impaired driving. On 25 January 1984 plaintiff Steven Herrod Barbee was likewise arrested and charged. Plaintiffs Henry and Barbee submitted to having their breath analyzed by a breath-testing machine known as the Intoxilyzer. Breath analysis showed that both men had an alcohol concentration of 0.10. Pursuant to the Act a revocation report on each man was properly filed and an order revoking each man's license was entered. Plaintiff Henry surrendered his license on 23 December 1983. Because plaintiff Barbee's license was expired at the time he was arrested, the arresting officer seized his license as evidence. Neither plaintiff requested a hearing to contest the validity of revocation.

On 30 December 1983 plaintiff Henry obtained a temporary restraining order requiring the clerk of superior court to return his license to him. At the hearing on the issuance of the restraining order it was stipulated that if Henry were present he would testify he was a traveling salesman who depended upon his driving privileges to maintain his livelihood. He would have testified further he had already suffered inconvenience and expense because of the revocation and would continue to suffer harm if the revocation was not suspended. On 9 April 1984 Henry filed a complaint seeking a declaratory judgment that the order revoking his license was unconstitutional.

Although Barbee never paid the $25 restoration cost, in March 1984 he applied for and, due apparently to clerical error, received a new driver's license. After learning he was required to pay a restoration fee in order to have his driving privileges reinstated, Barbee appeared before the clerk on 25 May 1984 to pay the $25 fee. The clerk seized Barbee's newly acquired license and informed him the new license would remain revoked for ten days.

Barbee obtained a temporary restraining order staying revocation. At the hearing on the issuance of the restraining order, it was stipulated that if Barbee were present, he would testify he needed his license to get to and from work and to accomplish matters essential to his health and welfare. On 25 May 1984 Barbee also filed a declaratory judgment action contesting the constitutionality of the order revoking his license.

The two actions were consolidated for hearing before Superior Court Judge Henry V. Barnette, Jr. The superior court concluded that the ten-day pretrial revocation provision of § 16.5 deprived plaintiffs of an interest in property in contravention of the Due Process Clause of the Fourteenth Amendment of the United States Constitution and the Law of the Land Clause of Article I, section 19 of the North Carolina Constitution. The superior court entered an order enjoining the state from revoking the plaintiffs' drivers' licenses.

The superior court employed a three-factor balancing test used in *Matthews v. Eldridge*, 424 U.S. 319, 47 L.Ed. 2d 18 (1976), to resolve the due process issue. These factors are:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Id.* at 335, 47 L.Ed. 2d at 53. The superior court concluded that plaintiffs had a substantial interest in continued possession of their driving privileges pending the outcome of the hearing due them. It also determined there was a substantial risk of error under the challenged procedures. It found that breath-testing machines have a margin of error of 10 percent and "there are means by which a defendant can challenge the validity" of test results. The superior court concluded as to the third factor that the fiscal and administrative burdens that additional or substitute procedures would entail were minimal. And although the state has a substantial interest in highway safety, this interest could be served by less drastic means than revoking a person's driver's

license for ten days. For example, a 24-hour revocation would be sufficient to insure highway safety.

Because the superior court struck down the revocation provision of § 16.5 on constitutional grounds, the court did not reach the merits of plaintiffs' argument that the statute was an unconstitutional punishment under the North Carolina Constitution. It did note, however, this argument "has merit."

We granted discretionary review on 12 December 1984 and now reverse.

### III.

[1] The Law of the Land Clause is the parallel provision in the state constitution to the Due Process Clause of the Fourteenth Amendment of the federal constitution. A decision by the United States Supreme Court interpreting the Due Process Clause is not binding on this Court when interpreting the law of the land. *Watch Co. v. Brand Distributors*, 285 N.C. 467, 206 S.E. 2d 141 (1974); *Horton v. Gulledge*, 277 N.C. 353, 177 S.E. 2d 885 (1970), *overruled on other grounds, State v. Jones*, 305 N.C. 520, 290 S.E. 2d 675 (1982). We would employ a different method for deciding what procedural safeguards are due under the Law of the Land Clause to a person deprived of a protected interest than the United States Supreme Court has proposed for deciding similar questions under the Due Process Clause. Accordingly, we will first decide whether the license revocation procedure of the Safe Roads Act comports with federal due process. Next we will measure that procedure against the requirements of our state's Law of the Land Clause.

### A.

No process is due a person who is deprived of an interest by official action unless that interest is protected by law, *i.e.*, unless it is an interest in life, liberty or property. The state concedes, as it must, that plaintiffs possess a protected property interest in their licenses. *See Bell v. Burson*, 402 U.S. 535, 29 L.Ed. 2d 90 (1971). One issue for us to decide, then, is whether the process provided by the ten-day revocation statute comports with the minimum standard of federal constitutional due process. In order to decide this issue we must employ the same three-factor balancing test relied upon by the superior court.

The United States Supreme Court relied upon this balancing test in *Mackey v. Montrym*, 443 U.S. 1, 61 L.Ed. 2d 321 (1979), to determine the validity of a Massachusetts statute which authorized prehearing revocation of licenses of persons who refused to submit to a breath analysis test. Although North Carolina's revocation procedure differs from Massachusetts' procedure in some ways, the two schemes are similar in many important respects.

Massachusetts revokes licenses only for test refusals. North Carolina revokes licenses if test results satisfy a judicial officer there is probable cause to believe, among other things, the person had a blood alcohol concentration of 0.10 or more. Furthermore, multiple postrevocation review is available in Massachusetts. A person whose license is revoked there has the right to a hearing before the revoking body, the registrar. Mass. Gen. Laws Ann. ch. 90, § 22(a) (West Supp. 1985). Unfavorable decisions in that body can be appealed to another administrative body, the board of appeal, *id.*, ch. 90 § 28, and ultimately to the courts. *Id.*, ch. 30A § 14. Although a person whose license is revoked in North Carolina has the right to a postsuspension hearing before a judicial officer, the decision of that judicial officer is final. A practical reason exists for the absence in North Carolina of the right of appeal from the decision of the hearing officer. The revocation period in Massachusetts is ninety days, *Mackey v. Montrym*, 443 U.S. at 12, 61 L.Ed. 2d at 330. The revocation period in North Carolina is only ten days. § 16.5(e). Assuming no extraordinary relief staying the revocation is obtained, the revocation period in North Carolina would be over before any meaningful appeal could be prosecuted.

Prompt postsuspension review is available both in Massachusetts and in North Carolina. In Massachusetts a postsuspension hearing is available immediately following revocation and a decision can be obtained, taking into account the possibility of weekends, within seven to ten days. *Mackey v. Montrym*, 443 U.S. at 7-8, n. 5, 61 L.Ed. 2d at 328. In North Carolina a decision can be obtained, taking into account the possibility of weekends, in less than a week. A hearing must be held and completed within five working days (three if the hearing is conducted by a magistrate rather than a district court judge) following revocation. § 16.5(g).

The United States Supreme Court upheld Massachusetts' revocation procedure using the balancing test mentioned above.

The Court held, "We conclude, as we did in *Love*, that the compelling interest in highway safety justifies the Commonwealth in making a summary suspension effective pending the outcome of the prompt postsuspension hearing available." *Mackey v. Montrym*, 443 U.S. at 19, 61 L.Ed. 2d at 335. We are satisfied that North Carolina's revocation procedure is not so dissimilar from that employed by Massachusetts and upheld in *Mackey* that it would alter the balance struck in that case in favor of constitutionality.

1.

The first factor that must be weighed is the private interest affected by the challenged official action. Here, as in *Mackey*, the private interest affected is a driver's privilege to operate a motor vehicle. More particularly, it is the driver's interest in continued possession and use of his driver's license pending the outcome of the hearing the driver is due. *Id.* at 11, 61 L.Ed. 2d at 330. This interest is not insubstantial because a license suspension can be shortened but cannot be undone. The state does not make a driver whole for any personal inconvenience and economic hardship suffered during a delay between erroneous deprivation and postsuspension restoration of driving privileges.[2]

Several factors affect the weight of the driver's interest in continuous use of driving privileges. One is the maximum revocation period. *Id.* at 12, 61 L.Ed. 2d at 331. The longer the suspension period the greater the private interest in being licensed. North Carolina provides for an abbreviated revocation period of only 10 days. A person could obtain alternate transportation, take vacation from work and reschedule appointments to make up for the loss of the person's driving privileges during that short period.

In *Mackey* the United States Supreme Court held that the private interest involved in that case was less substantial than the private interest involved in *Dixon v. Love*, 431 U.S. 105, 52 L.Ed. 2d 172 (1977). In *Love* the Court upheld the constitutionality of a statute authorizing the state to suspend summarily for up to

---

2. The superior court found here, for example, that plaintiffs Henry and Barbee had suffered damages to their businesses, inconvenience and expense and would continue to do so until their licenses were reinstated.

twelve months repeat traffic offenders' licenses without a preliminary hearing. The Court in *Mackey* reasoned that Massachusetts' procedure authorized suspension for only ninety days while the Illinois procedure involved in *Love* permitted suspension for as long as one year. The private interest involved in the case before us is even less substantial than that involved in *Mackey* as the maximum length of revocation here is ten days. And while the maximum revocation period is ten days, the maximum period of actual, wrongful deprivation is even shorter because of the availability of prompt postsuspension review.

The timeliness of postsuspension review is another factor bearing on the weight of the private interest in being licensed. *Mackey v. Montrym*, 443 U.S. at 12, 61 L.Ed. 2d at 330-31. Prompt postsuspension review is available in North Carolina. Section 16.5(e) requires that a judicial officer must at the time the judicial officer orders a person's license revoked personally inform the person of the person's right to a hearing at which the person may contest the validity of the revocation. The hearing must be completed within three working days following a request for such hearing (or within five working days following a request for a hearing before a district court judge). If a requested hearing is not held and completed within the prescribed time, the judicial officer who ordered revocation must enter another order revoking it. § 16.5(g).

Plaintiffs observe that no limited driving privilege for driving to work, alcohol rehabilitation or elsewhere is available under North Carolina procedure. The existence or absence of hardship relief is one factor affecting the weight of the private interest in licensing. *See Dixon v. Love*, 431 U.S. 105, 52 L.Ed. 2d 172. The United States Supreme Court indicated in *Mackey*, however, the existence of such relief is not the "controlling" factor in deciding a statute's constitutionality. *Mackey*, 443 U.S. at 12, 61 L.Ed. 2d at 330. The Court distinguished the procedure involved in *Love*, which made a limited driving privilege available, from the one at issue in *Mackey*, which provided no hardship relief.

> The bearing such provisions [for hardship relief] had in *Love* stemmed from the delay involved in providing a postsuspension hearing. Here, unlike the situation in *Love*, a postsuspension hearing is available *immediately* upon a driver's

suspension and may be initiated by him simply by walking in-
to one of the Registrar's local offices and requesting a hear-
ing. The *Love* statute, in contrast, did not mandate that a
date be set for a postsuspension hearing until 20 days after a
written request for such a hearing was received from the af-
fected driver.

*Mackey v. Montrym,* 443 U.S. at 12, 61 L.Ed. 2d at 330-31. In this
case as in *Mackey* prompt postsuspension review is available. The
presence of such review reduces the need for hardship relief and
together with the brevity of the suspension period reduces the ac-
tual weight of the private interest in continuous use and posses-
sion of one's driver's license pending the outcome of the hearing.

2.

The second step in the balancing test requires us to weigh
the risk of erroneous deprivation of the private interest as a
result of the procedures used and the probable value of additional
procedural safeguards. Due process does not mean, however, that
governmental decision making must comply with standards that
assure error-free determinations. *Mackey v. Montrym,* 443 U.S. at
13, 61 L.Ed. 2d at 331. Some process short of an evidentiary hear-
ing sometimes will be sufficient to permit the state to take ad-
verse administrative action. When, as in this case, prompt post-
deprivation review is available, what is generally required is no
more than that the predeprivation procedures used be designed
to provide a reasonably reliable basis for determining that the
facts justifying the official action are as a responsible government
official warrants them to be. *Id.*

We believe North Carolina's predeprivation procedure pro-
vides a reasonably reliable basis for determining that the facts
justifying revocation are as alleged by the revoking authority.
Cause exists for license revocation in North Carolina if: (1) A per-
son is arrested and charged with an impaired driving offense; (2)
the charging officer and the chemical analyst who administers the
breath test to the person charged comply with statutorily pre-
scribed procedures for breath testing; and (3) the person has an
alcohol concentration of 0.10 or more or refuses to submit to
breath testing. § 16.5(b). If cause for revocation exists, the charg-
ing officer and chemical analyst must expeditiously execute and
file a revocation report with a judicial officer. § 16.5(c). The

report must contain a sworn statement of facts indicating the conditions of revocation have been met. § 16.5(a)(4). The judicial officer must determine if there is probable cause to believe that each condition of revocation has been met. If the judicial officer finds such probable cause, he must enter an order revoking the person's driver's license.

The facts of arrest surrounding the impaired driving charge as well as compliance with chemical analysis procedures, the first two conditions of revocation, are both matters within the personal knowledge of the reporting officer. That officer must swear to the truthfulness of the matters in the revocation report. Although, as the dissenters in *Mackey* pointed out, the police version of a disputed encounter between the police and a private citizen may not be inherently reliable, 443 U.S. at 24, 61 L.Ed. 2d at 338, North Carolina's procedure provides an additional check on police excess not found in *Mackey*. Before revocation can take place in North Carolina, a detached and impartial judicial officer must scrutinize every condition of revocation to determine if there is probable cause to believe each condition has been met, including the required blood alcohol content. This probable cause hearing provides a more meaningful process to a driver than the "informal opportunity" granted in *Mackey* for a driver to tell his or her side of the story to the police. *Mackey*, 443 U.S. at 14, 61 L.Ed. 2d at 332.

The superior court apparently found no inherent risk of error in North Carolina's presuspension procedure insofar as that procedure is used to determine whether the first two conditions of revocation are present. The superior court ruled, however, that "there is an appreciable risk, if not a substantial risk, of an erroneous deprivation" of plaintiffs' interests, insofar as that procedure is used to determine whether a person has an alcohol concentration of 0.10. The superior court found as fact that breath-testing machines have a margin of error of approximately 10 percent. There are means, the superior court further found, of challenging the validity of a breath test. Plaintiffs point out in this connection that a person's attorney could examine the preventive maintenance logs kept on the breath machines used to test a person. Witnesses present when the person was drinking also could be consulted to determine if the test results were consistent with the amount of alcohol the person claims to have drunk.

Although such means to challenge the validity of a breath test exist, the superior court found the Safe Roads Act provides no presuspension opportunity to challenge these results. The superior court concluded that given time to accumulate evidence and a meaningful hearing, a person who registers a 0.10 alcohol concentration during breath testing could demonstrate his actual alcohol concentration was lower.

We think the district court overstated the risk of error inherent in the revoking authority's initial reliance on unchallenged breath-test results. In *State v. Shuping*, 312 N.C. 421, 323 S.E. 2d 350 (1984), this Court addressed a concern similar to that expressed by the superior court in this case. In *Shuping* the defendant argued that because breath-test results may deviate by as much as 10 percent when the machine is operating properly, her alcohol concentration could have been 0.09 rather than 0.10 as reported. We observed that before a person's breath is analyzed, a procedure "in the nature of a control test" is employed. *Id.* at 427, 323 S.E. 2d at 354. The breath-testing machine operator introduced into the machine a sample of air from a jar containing a known solution of 0.10 alcohol. If the machine yields the expected reading or deviates by 10 percent *below* the expected reading, the machine may be used to take defendant's actual breath sample. The machine may not be used if it deviates by more than 10 percent under the expected reading. *No* deviation *above* the expected reading is permitted. *Id.* at 427-28, 323 S.E. 2d at 354. "Consequently, any 'error,' if error there be, [is] fully in favor of defendant." *Id.* at 430, 323 S.E. 2d at 355. We also observed in *Shuping*:

> Courts in several states have reviewed the accuracy and reliability of breath-testing devices . . . and have determined them to be reliable scientific instruments. *Romano v. Kimmelman*, 96 N.J. 66, 474 A. 2d 1 (1984); *Heddan v. Dirkswager*, 336 N.W. 2d 54 (Minn. 1983); *People v. Tilley*, 120 Misc. 2d 1040, 466 N.Y.S. 2d 983 (Co. Ct. 1983); *State v. Keller*, 36 Wash. App. 110, 672 P. 2d 412 (1983); *State v. Rucker*, 297 A. 2d 400 (Del. Super. Ct. 1972).

*Shuping*, 312 N.C. at 431, 323 S.E. 2d at 355-56.

In *Heddan v. Dirkswager*, 336 N.W. 2d 54 (Minn. 1983), the Minnesota Supreme Court considered a challenge to Minnesota's

prehearing license revocation statute. Minnesota, like North Carolina, revokes licenses of drivers who fail a breath test. *Id.* at 61. The Minnesota Supreme Court used the three-factor balancing test to determine the constitutionality of Minnesota's revocation procedure. The appellants in *Heddan* attempted to distinguish Minnesota's revocation statute from the Massachusetts statute upheld in *Mackey.* They argued the risk of erroneous deprivation of a license due to the "infinite possibilities of error" inherent in breath testing was a significant difference in the two state's statutes. *Id.* The court rejected this contention. It observed:

> This court has previously considered the reliability of Breathalyzer testing. In *State v. Quinn,* 289 Minn. 184, 186, 182 N.W. 2d 843, 845 (1971), we stated:

> > It is generally held that the alcoholic content of the blood may be reliably determined by such a test, and testimony of the reading obtained upon a properly conducted test may be admitted without antecedent expert testimony that the reading is a trustworthy index of alcohol in the blood.

> (Citations omitted.)

> Three experts testified for the state as to the accuracy and reliability of the Breathalyzer test. Mr. Richard Prouty, Chief Forensic Toxicologist, Office of Medical Examiner, State of Oklahoma, noted that:

> > [T]he Breathalyzer and its various models are and have been internationally accepted and recognized as a reliable evidentiary device for determining blood alcohol content.

> Mr. Lowell Van Berkom, BCA Laboratory Director, stated:

> > [T]he use of the Breathalyzer Model 900 and 900A in accordance with this Breathalyzer operational checklist 21-step procedure provide a highly accurate and scientifically acceptable result of breath analysis for alcohol.

> Mr. Phillip L. Neese, supervisor of the chemical testing unit for the Minneapolis Police Department, noted that 'the Breathalyzer was an accurate instrument, but that the readings were slightly *lower* than blood tests.' (Emphasis added.)

*Heddan v. Dirkswager*, 336 N.W. 2d at 61-62.

No machine, of course, in infallible. A presuspension hearing in which a person is permitted to offer evidence challenging breath-test results may reduce even further the already insubstantial risk that a person's alcohol concentration was not at least 0.10 as reported. We believe, nevertheless, that breath-test results are not so inherently erroneous that additional procedural safeguards, such as a predeprivation evidentiary hearing, would contribute appreciably to the truth finding process. The prerevocation procedure of the Safe Roads Act, including its initial reliance on the results of breath testing, provides at least a reasonably reliable basis for determining that the conditions required for revocation are met.

3.

The third and final factor that must be weighed is the state's interest served by the summary procedure used, including the state function involved and the fiscal and administrative burdens that would result from additional procedures argued to be necessary.

The ten-day revocation prescribed by § 16.5 promotes the state's important police function of protecting the safety of its people. States have broad authority to adopt summary procedures to protect public health and safety. *Mackey v. Montrym*, 443 U.S. at 17, 61 L.Ed. 2d at 334. If as in *Mackey* the state's interest in public protection was served by summary suspension of drivers' licenses of persons who refused to take a breath test, public protection should be furthered even more by suspending the licenses of persons whose test results show them to have a prohibited blood alcohol concentration.

The state's interest in public protection is primarily served by the summary procedure's removing a person from the streets and highways when there is probable cause to believe the person presents a hazard to the safety of himself and other wayfarers. *Id.* at 18, 61 L.Ed. 2d at 334. The summary and automatic character of revocation is reasonably related to the statute's purpose. If no such prehearing suspension were available, the driver would continue as a threat to lives and property during the time after the driver's arrest for impaired driving and before the driver was afforded a revocation hearing.

Plaintiffs contend, however, that a ten-day suspension is not reasonably related to the state's interest in shielding the public from the danger posed by a driver who fails a breath test. They argue the revocation period is both too long and too short. They say a ten-day revocation is unnecessarily long if the purpose is to protect the public from the hazards of an impaired driver on the particular occasion for which he is arrested. Plaintiffs suggest a twenty-four hour revocation would be sufficient to achieve this purpose. On the other hand, they argue a ten-day revocation is too short to protect the public from future incidents of impaired driving by the same driver. A longer suspension would be necessary for this purpose.

Although one purpose of summary license revocation is to safeguard the public from an impaired driver on the particular occasion on which the driver is arrested, the revocation has a broader purpose. The statute authorizing revocation assumes implicitly that drivers who have driven impaired on one occasion pose an appreciable risk of repeating their conduct. We cannot say this assumption is so unreasonable as to prevent the state from summarily suspending a person's driving privileges.[3] Because one purpose of revocation is to protect the public from potential future incidents of impaired driving, the revocation period is not excessive.

Plaintiffs, however, have no cause to complain the suspension period is not long enough. The ten-day revocation period protects against future incidents of impaired driving in the period immediately following arrest. This short revocation serves as an in-

---

3. The National Transportation Safety Board reports that 30 percent of the 773,000 drunk driving convictions each year are repeat offenders. National Transportation Safety Board, *Deficiencies in Enforcement, Judicial, and Treatment Programs Related to Repeat Offender Drunk Drivers*, Report No. NTSB/33-84104 (1984).

A study prepared for the National Highway Traffic Safety Administration using North Carolina data through 1974 predicted that almost 8 percent of persons with a previous conviction for impaired driving would be involved in an alcohol related *crash* in the following year. These persons presented a. risk twenty-one times greater than that of the general population as a whole of being involved in such a crash. These predictions proved to be substantially valid. *See* J. Lacey, J. Stewart, F. Council, 1 Techniques for Predicting High-Risk Drivers For Alcohol Countermeasures (1979) (available at University of North Carolina Highway Safety Research Center).

terim highway safety measure until after a person is afforded a trial. At that time further protection of the public is available. Section 17 provides for a one-year license suspension following an impaired driving conviction. The duration of this stop-gap protection is especially appropriate in light of the summary procedure through which it is imposed. We believe the ten-day revocation is well tailored to the state's interest in the summary procedure employed.

Finally, in connection with the state's interest in the summary revocation procedure, the United States Supreme Court has observed that a presuspension hearing would also impose a substantial fiscal and administrative burden on the state. The availability of such a hearing would encourage frivolous requests for hearings. Drivers would have a significant incentive to demand such a hearing as a dilatory tactic to maintain possession of their driving privileges. *Mackey v. Montrym*, 443 U.S. at 18, 61 L.Ed. 2d at 334-35.

After balancing the Act's procedures for revoking a person's driver's license, we conclude the state's compelling interest in highway safety outweighs the private interests involved and any risk of erroneously depriving those interests. We hold the Act's prehearing suspension provisions do not deprive plaintiffs of property without due process of the law.

B.

We are not satisfied with using a balancing test as a gauge to determine what procedural steps our state's Law of the Land Clause requires before the state may deprive a person of a protected interest. The balancing test is open to several objections. First, it makes the decision making process unduly responsive to the subjective notions of the decision makers. Each court must make its own assessment of the weight to be afforded the private interest, the state's interest and the value of additional procedures. Second, infusion of this subjectivity into the decision making process necessarily leads to unpredictable and sometimes inconsistent results. In this case, for example, the superior court judge reached a different conclusion about the constitutionality of the revocation statute than did we using the same balancing test.

The root of the problem with using the balancing test to determine whether the process provided by a statute is that

which is constitutionally due is that the test confuses the judicial and legislative functions. The role of the legislature is to balance the weight to be afforded to disparate interests and to forge a workable compromise among those interests. The role of the Court is not to sit as a super legislature and second-guess the balance struck by the elected officials. Rather than rebalancing, the Court's role is only to measure the balance struck by the legislature against the required minimum standards of the constitution. The best way for the Court to discharge this function is for it to enunciate a workable principle as to what process the law of the land minimally requires.

We glean such a principle from certain federal cases decided under the Fourth Amendment and Due Process Clauses.[4] In *Gerstein v. Pugh*, 420 U.S. 103, 43 L.Ed. 2d 54 (1975), the United States Supreme Court considered a Fourth Amendment challenge to a Florida procedure for detaining persons arrested without a warrant who were unable to post bail. Florida permitted such persons to be detained for a substantial period of time solely on the basis of a prosecutor's determination of probable cause. *Id.* at 106, 43 L.Ed. 2d at 60-61. The Court observed that a person could not be deprived of liberty under the procedure prescribed by the Fourth Amendment unless there exists probable cause to believe the suspect had committed an offense. Furthermore, to implement the Fourth Amendment's protection against unfounded invasions of liberty, the existence of probable cause must be decided by a neutral and detached judicial officer whenever possible. *Id.* at 112, 43 L.Ed. 2d 64. "Accordingly," the Court held, "the Fourth Amendment requires a judicial determination of probable cause as a prerequisite to extended restraint of liberty following arrest." *Id.* at 114, 43 L.Ed. 2d at 65.

The Court went on to discuss the processes which must attend the judicial determination of probable cause after a person is arrested without a warrant. The courts below had held "the determination of probable cause must be accompanied by the full

---

4. Although a separate constitutional provision, the Fourth Amendment affords procedural protection related to that given by the Due Process and Law of the Land Clauses. The Fourth Amendment protects individuals from specific intrusions into liberty occasioned by prohibiting unreasonable searches and seizures and by requiring in part that "no warrants shall issue but upon probable cause . . . ."

panoply of adversary safeguards — counsel, confrontation, cross-examination, and compulsory process for witnesses." *Id.* at 119, 43 L.Ed. 2d at 68. The Court overruled these holdings:

> These adversary safeguards are not essential for the probable cause determination required by the Fourth Amendment. The sole issue is whether there is probable cause for detaining the arrested person pending further proceedings. This issue can be determined reliably without an adversary hearing. The standard is the same as that for arrest. That standard — probable cause to believe the suspect has committed a crime — traditionally has been decided by a magistrate in a nonadversary proceeding on hearsay and written testimony, and the Court has approved these informal modes of proof.

*Id.* at 120, 43 L.Ed. 2d at 69 (footnote omitted).

In a related case the court upheld a New York statute which authorized pretrial detention of accused juvenile delinquents. Detention was based on a judicial officer's finding of a " 'serious risk' " that the child " 'may before the return date commit an act which if committed by an adult would constitute a crime.' " *Schall v. Martin,* 467 U.S. 253, 255, 81 L.Ed. 2d 207, 211 (1984). This finding was made at the juvenile's initial appearance. Within three days following the juvenile's initial appearance, the detained juvenile was entitled to a formal, adversarial probable cause hearing. The Court observed: "There is no doubt that the Due Process Clause is applicable in juvenile proceedings. 'The problem,' we have stressed, 'is to ascertain the precise impact of the due process requirement upon such proceedings.' " *Id.* at 263, 81 L.Ed. 2d at 216. In order to answer this question the Court made two further inquiries: First, whether preventive detention in New York serves a legitimate state objective; second, whether the procedural safeguards employed by the statute were adequate. *Id.* at 263-64, 81 L.Ed. 2d at 216-217. In response to the first inquiry, the Court stated:

> We find no justification for the conclusion that, contrary to the express language of the statute and the judgment of the highest state court, § 320.5(3)(b) is a punitive rather than a regulatory measure. Preventive detention under the Family Court Act serves the legitimate state objective, held in com-

mon with every State in the country, of protecting both the juvenile and society from the hazards of pretrial crime.

*Id.* at 274, 81 L.Ed. 2d at 223. The Court also held the procedural safeguards employed by the pretrial detention statute were adequate. Although the statute provided a formal adversarial probable cause hearing before a juvenile could be finally detained, we believe the essential saving feature of the statute was that a detached judicial officer decided both initially whether detention was necessary in the interests of society and subsequently whether there existed probable cause justifying further detention.

Finally, in *Johnson v. United States*, 333 U.S. 10, 92 L.Ed. 436 (1947), we observe a similar concern for judicial intervention in the probable cause determination. In that case the police received information that persons were smoking opium in a hotel. The police went to the hotel, traced the odor of burning opium to a certain room, and without a search warrant knocked on the door. When the petitioner answered, the police placed her under arrest, searched the room and found incriminating evidence. In what is now the classic statement of the rule, the Court held:

> The point of the Fourth Amendment, which often is not grasped by zealous officers, is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence. Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime. Any assumption that evidence sufficient to support a magistrate's disinterested determination to issue a search warrant will justify the officers in making a search without a warrant would reduce the Amendment to a nullity and leave the people's homes secure only in the discretion of police officers. Crime, even in the privacy of one's own quarters, is, of course, of grave concern to society, and the law allows such crime to be reached on proper showing. The right of officers to thrust themselves into a home is also a grave concern, not only to the individual but to a society which chooses to dwell in reasonable security and freedom from surveillance. When the right of privacy must reasonably yield to the right of search is, as a rule, to be decided by a judicial officer, not by a policeman or Government enforcement agent.

*Id.* at 13-14, 92 L.Ed. at 440 (footnotes omitted).

[2] Implicit in the foregoing cases is the following principle: When the furtherance of a legitimate state interest requires the state to engage in prompt remedial action adverse to an individual interest protected by law and the action proposed by the state is reasonably related to furthering the state interest, the law of the land ordinarily requires no more than that before such action is undertaken, a judicial officer determine there is probable cause to believe that the conditions which would justify the action exist.

After a person charged with impaired driving fails a breath test, prompt remedial action by the state is needed. Such a person, as noted above, represents a demonstrated present as well as appreciable future hazard to highway safety. The safety of the impaired driver and other people using the state's highways depends upon immediately denying the impaired driver access to the public roads. Action is required before the person charged can receive a full evidentiary hearing. Substantial preparation is required before such a hearing can take place, but the impaired driver continues to pose a safety hazard while the hearing is pending.

[3] The ten-day revocation is also reasonably related to furthering of the state's interest in highway safety. A suspension of ten days, as noted above, provides immediate protection against the probably impaired driver and serves as an interim highway safety measure until after a person is afforded a trial. Because the summary ten-day license revocation is a remedial measure reasonably related to the state's interest in highway safety, the law of the land is satisfied by judicial review of the state's action to determine if there is probable cause to believe the conditions justifying revocation exist. The Act provides for such review. Before revocation can take place, a detached and impartial judicial officer must scrutinize every condition of revocation to determine if each condition probably has been met. § 16.5(e). This constitutes all the process plaintiffs are due under the law of the land before their licenses were revoked for the ten-day period.

Plaintiffs contend, however, the revocation statute is not a remedial measure but punishment. Although the law of the land would not permit the state to punish a person except after a trial,

*Bell v. Wolfish*, 441 U.S. 520, 60 L.Ed. 2d 447 (1979)[5] we find no merit in plaintiffs' contention that the summary ten-day revocation is punishment. We have already answered many arguments plaintiffs advance in support of this contention at other places in this opinion.[6] Plaintiffs' principal argument which we have not yet answered relates to legislative intent. Plaintiffs cite these observations of one commentator:

> This [revocation] provision serves a couple of functions important to the Governor and the proponents of the bill. First, it provides an immediate 'slap in the face' to virtually all drivers charged with DWI. Second, the fact that it is imposed independent of the trial on the criminal charge makes it more certain that a sanction will be imposed, regardless of the defendant's status or his lawyer's expertise.

"Impaired Driving; The Safe Roads Act," *A Summary of Legislation in the 1983 General Assembly of Interest to North Carolina Public Officials* 117 (1983).

We conclude, nevertheless, that the summary revocation procedure of § 16.5 is not a punishment but a highway safety measure. Whatever the intent of individual proponents of the bill, the bill as finally enacted reflects an intent by the legislature for the revocation provision to be a remedial measure. The revocation statute provides, "Proceedings under this section are civil actions, and must be identified by the caption 'In the Matter of _____.' " While we are reminded that the substance of a law and not just the label given to it by the legislature is determinative as to its validity, *see Shore v. Edmisten, Atty. Gen.,* 290 N.C. 628, 227 S.E. 2d 553 (1976), our cases hold that revocation proceedings are civil rather than criminal in nature. *State v. Carlisle,* 285 N.C. 229, 204 S.E. 2d 15 (1974); *Joyner v. Garrett, Comr. of Motor Vehicles,* 279 N.C. 226, 182 S.E. 2d 553 (1971). "The purpose of a revocation proceeding is not to punish the offender, but to remove from the highway one who is a potential

---

5. Although *Bell* was decided under federal due process principles, the law of the land cannot constitutionally afford less procedural protection than that afforded by due process.

6. Plaintiffs argue, for example, a revocation period of ten days is not reasonably related to the state's interest in promoting highway safety.

hazard to himself and others." *State v. Carlisle*, 285 N.C. at 232, 204 S.E. 2d at 16. Revocation is not added punishment for a criminal act but a finding that a driver is no longer fit to hold and enjoy the driving privilege which the state has granted under its police power. *Harrell v. Scheidt, Comr. of Motor Vehicles*, 243 N.C. 735, 92 S.E. 2d 182 (1956).

## IV.

**[4]** Plaintiffs contend by cross-assignment of error that the license suspension provisions of the Safe Roads Act denies them equal protection of the laws under the state and federal constitutions. They contend the revocation scheme differentiates without rational basis between persons arrested for impaired driving offenses and other traffic offenders. Persons arrested for impaired driving offenses have their licenses revoked once in a civil proceeding and again later if convicted of a crime. *See* § 17. While there are other serious traffic offenses besides impaired driving, the legislature has provided double revocation only for impaired driving offenses.

Plaintiff Barbee further contends the revocation provision of § 16.5 unfairly discriminates against persons whose drivers' licenses have expired at the time they are arrested. Because his license was expired and seized as evidence by the officer who arrested him for impaired driving, Barbee could not surrender his expired license. His driving privileges were not reinstated until he obtained a new license and surrendered it for ten days. Barbee contends the state has no rational basis for extending the revocation period until ten days after a person obtains and surrenders a new license.

There is no doubt the police power of the state is subordinate to the equal protection guarantees of the federal and state constitutions. *Town of Atlantic Beach v. Young*, 307 N.C. 422, 298 S.E. 2d 686, *appeal dismissed*, 462 U.S. 1101, 77 L.Ed. 2d 1328 (1983). Because plaintiffs do not contend, and we do not find, persons arrested for impaired driving offenses are a suspect class or that the right to drive is a fundamental right, we employ the following analysis to this case.

When an equal protection claim does not involve a 'suspect class' or a fundamental right, the lower tier of equal

protection analysis is employed. *E.g., Vance v. Bradley*, 440 U.S. 93, 59 L.Ed. 2d 171, 99 S.Ct. 939 (1979). This mode of analysis merely requires that distinctions which are drawn by a challenged statute or action bear some rational relationship to a conceivable legitimate governmental interest. *E.g., New Orleans v. Dukes*, 427 U.S. 297, 49 L.Ed. 2d 511, 96 S.Ct. 2513 (1976); *Hagans v. Lavine*, 415 U.S. 528, 39 L.Ed. 2d 577, 94 S.Ct. 1372 (1974).

*Texfi Industries v. City of Fayetteville*, 301 N.C. 1, 11, 269 S.E. 2d 142, 149 (1980).

The state has a reasonable basis for drawing a distinction between impaired drivers and other traffic offenders for purposes of license revocation. The state has a legitimate interest in protecting the motoring public. A person for whom there is probable cause to believe has a blood alcohol concentration of 0.10 poses a demonstrated present and potential future threat to the safety of himself and other highway travelers. The legislature reasonably could have believed traffic offenders who are not so impaired do not present such an impending threat. The legislature's decision to revoke at the time of arrest the licenses of probably impaired drivers but not other traffic offenders bears a rational relationship to the state's legitimate interest in highway safety. Accordingly, we hold that the revocation required by § 16.5 does not violate the equal protection rights guaranteed by the state and federal constitutions.

[5] We need not address the issue of whether § 16.5 as applied to plaintiff Barbee infringes his equal protection rights. The revocation statute did not authorize the revoking authorities to seize Barbee's newly obtained license. The statute authorizing revocation provides that if a judicial officer finds probable cause to revoke a person's driver's license,

the judicial officer must order the person to surrender his license and if necessary may order a law-enforcement officer to seize the license. . . . Unless the person is not currently licensed, the revocation under this subsection begins at the time the revocation order is issued and continues until the person's license has been surrendered for 10 days and the person has paid the applicable costs. *If the person is not currently licensed, the revocation continues until 10 days from*

*the date the revocation order is issued and the person has paid the applicable costs.*

§ 16.5(e) (emphasis added).

The revocation statute is ambiguous with respect to the duration of the suspension period. The statute can be read to mean either that revocation continues: (1) until the person has paid the applicable costs and at least ten days have elapsed from the date the revocation order is issued or (2) until ten days from the date the revocation order is issued and the date the person has paid the applicable costs, whichever occurs last.

When a statute is ambiguous the Court must resort to construction to ascertain legislative intent. *Young v. Whitehall Co.,* 229 N.C. 360, 49 S.E. 2d 797 (1948). A maxim of statutory construction is that where a statute is susceptible of two reasonable interpretations, one of which will raise a serious constitutional question, the interpretation which avoids this question should be adopted. *In re Arthur,* 291 N.C. 640, 231 S.E. 2d 614 (1977).

The interpretation of the revocation statute which extends revocation for ten days after revocation costs are paid raises a serious question as to the statute's constitutionality. Continuing revocation for ten days after a person pays the revocation fee seems unrelated to any legitimate state interest. The date when a person pays the fee is not reasonably related to the state's legitimate goal of highway safety. Although the state does have a legitimate interest in recouping the costs of administering the revocation scheme, this interest would be fully served by extending the revocation period until the date a person pays the costs. It would not be served by continuing revocation beyond that time. The first construction of the statute, which extends revocation only until applicable revocation costs are paid, avoids the constitutional problems associated with the second interpretation. We hold, therefore, the first interpretation of the statute is the correct one.

Well after ten days from the date revocation of his license was ordered, plaintiff Barbee appeared on 25 May 1984 before the Wake County Clerk of Court to pay the $25 restoration fee. The clerk's office seized Barbee's new license and informed him his license would continue in a state of revocation for ten days. In ex-

tending the revocation period to Barbee's new license after he tendered the restoration fee, the clerk's office exceeded its statutory authority.

## V.

[6] Plaintiffs contend by cross-assignment of error that the ten-day suspension provision of the Safe Roads Act is a punishment not authorized by Article XI, section 1 of the North Carolina Constitution. That provision provides: "The following punishments only shall be known to the laws of this state: death, imprisonment, fines, removal from office, and disqualification to hold and enjoy office of honor, trust, or profit under this state." N.C. Const. Art. XI, § 1. We find no merit in this contention. The license revocation procedure of § 16.5, as noted above in Part III, is not a punishment but a highway safety measure.

To summarize our holdings, the revocation provisions of § 16.5 do not infringe the due process, law of the land or equal protection rights guaranteed plaintiffs under the state and federal constitutions. Revocation, also, is not a punishment unauthorized by the state constitution.

For all the reasons set forth above the decision of the superior court is reversed as to plaintiff Henry in No. 84CVS2347. As to plaintiff Barbee in No. 84CVS3414 the decision of the superior court is modified and affirmed.

In Case No. 84CVS2347, reversed.

In Case No. 84CVS3414, modified and affirmed.

Justice BILLINGS took no part in the consideration or decision of this case.